RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────

BRITTANY HARRIS,

　　　　　　　*Plaintiff-Appellant*,

*v.*

KIMBERLY KLARE,

　　　　　　　*Defendant-Appellee*.

┐
│
│
│
│
> No. 17-6051
│
│
│
┘

────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:15-cv-00138—David L. Bunning, District Judge.

Argued: May 2, 2018

Decided and Filed: September 5, 2018

Before: COLE, Chief Judge; GIBBONS and BUSH, Circuit Judges.

────────────

## COUNSEL

**ARGUED:** David L. Engler, ENGLER LAW FIRM, Warren, Ohio, for Appellant. Claire E. Parsons, ADAMS, STEPNER, WOLTERMANN & DUSING, Covington, Kentucky, for Appellee. **ON BRIEF:** David L. Engler, ENGLER LAW FIRM, Warren, Ohio, for Appellant. Claire E. Parsons, Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, Covington, Kentucky, for Appellee.

────────────

## OPINION

────────────

JOHN K. BUSH, Circuit Judge. Seventeen-year-old Brittany Harris was a passenger in her family's minivan when it was pulled over by police officers in Erlanger, Kentucky. Later,

Officer Kimberly Klare was summoned to escort Harris to a nearby restroom and, while doing so, searched her in allegedly inappropriate and unlawful ways.  Harris brought suit under 42 U.S.C. § 1983, claiming that the search violated the Fourth Amendment.  This appeal requires us to determine whether the district court erred in granting summary judgment to Klare.  Because a reasonable jury could find that Klare's search of Harris was unconstitutional and that Klare is not entitled to qualified immunity, we reverse.

# I

## A.  Factual Background

Because the district court granted summary judgment, we review the facts "in the light most favorable to the nonmoving party," in this case, Brittany Harris.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).  Viewed in that light, the facts are as follows.

On May 22, 2014, Harris, along with her mother, father and older sister, went out for dinner at TGI Friday's.  On the way home, their minivan was stopped by City of Erlanger police officers because of an obstructed license plate.  The officers then conducted an investigation of Harris's mother, who was the driver.  Her mother was arrested for obstructing a license plate, driving with no registration plates, driving with a suspended license, and possession of a forged instrument.[1]

During the investigation, officers also noticed that Harris's father had "equipment for his work" in the vehicle, including "tools, like screwdrivers and wrenches," some of which were "sitting out" and some of which were "in containers."  Based on the presence of these tools in conjunction with the violations listed above, the officers began to suspect that Harris's mother was engaged in drug activity.  They sent for a drug dog, but it found no drugs.

The wait for the drug dog to arrive took about an hour, and Harris needed to use the restroom.  In order to escort Harris to the restroom, the police summoned a female officer, Kimberly Klare. Before Klare escorted Harris to the restroom, the officers asked Harris's father if Klare had his permission to do so, and he consented.  While waiting near the minivan, Harris

---

[1]The record is unclear as to whether Harris's mother was ever charged with any crime.

observed Klare "put her hand on her gun . . . three, four times." Harris and Klare did not leave until after Harris's mother had been arrested and, according to Harris, after the dog's sniffing—and indication that no drugs were in the minivan—was completed.[2]

En route to the restroom, Klare told Harris that she "may have to search" her. Klare then asked Harris, "would you step over here," to which Harris answered "yes" and walked to the requested location. By this time, the snap securing Klare's gun was unfastened, and she placed her hand on the gun five times while talking to Harris.

The parties agree that at this point, Klare secured Harris's hands behind her back. What happened next is disputed, but, as noted, for purposes of this summary judgment appeal, we must accept Harris's version of events. She claims that, as part of a pat down, Klare placed her hands under Harris's brassiere and pinched the girl's breasts, causing bruising. According to Harris, Klare told her that she searched her the way she did because a previous suspect at that location had "stuffed needles in her bra" and because "[y]ou have that look," "[y]ou have the look of a junkie whore." But Klare found no drugs, drug paraphernalia, weapon, or other contraband on Harris.

## B. Procedural History

Harris sued Klare, asserting claims under 42 U.S.C. § 1983 and Kentucky law.[3] Klare moved for summary judgment, arguing that Harris had consented to the search and that, even if she had not, Klare was protected by qualified immunity. Harris responded that any consent she had given to the search was invalid, both because she had been illegally seized and because her consent was coerced rather than voluntarily obtained.

The district court agreed with Klare. It held that the officers had probable cause to stop the minivan because of the obscured license plate and that the presence of Harris's father's tools and equipment in the car, in conjunction with her mother's alleged misfeasance, created a reasonable suspicion of drug activity, thereby permitting the officers to prolong the seizure while

---

[2]Klare disputes that the drug-dog sniffing had been completed before she escorted Harris away from the minivan.

[3]The state law claims are not at issue in this appeal.

they completed their investigation.  Declining to find that Harris had in fact consented to the subsequent search, the district court instead held that a reasonable officer in Klare's position nonetheless could believe that Harris had consented and that Klare was therefore protected by qualified immunity.

## II

We review de novo a district court's grant of summary judgment.  *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016).  Summary judgment is appropriate only when "no genuine dispute as to any material fact" exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Fourth Amendment begins: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  A search is per se reasonable, however, if the subject of that search freely and voluntarily gives consent to the search.[4]  *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998).

Harris argues that Klare's search was unreasonable for two reasons.  First, if an individual is illegally seized, her consent to a search is generally "tainted by the illegality" of that seizure and therefore insufficient to make the search reasonable.  *Florida v. Royer*, 460 U.S. 491, 507–508 (1983); *see also United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). Second, consent does not render a search reasonable if that consent is not "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion."  *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)).

Klare disputes that either basis to invalidate the search applies here.  She also raises the defense of qualified immunity, under which Klare is entitled to summary judgment "unless the

---

[4]Not all searches require consent to be reasonable, but Klare does not argue that the search was reasonable absent Harris's consent.

facts alleged would permit a reasonable juror to find that . . . the [violated] right was clearly established" at the time of the search. *Ellison v. Balinksi*, 625 F.3d 953, 959 (6th Cir. 2010).

## A. The Seizure

The parties agree that if Harris was not legally seized at the time of the search, the search was itself illegal. They also agree that the initial seizure of the minivan and its passengers, under suspicion of a moving violation, was legal. And they agree that because that seizure was an "investigative detention rather than a custodial arrest . . . [o]nce the purposes of the initial traffic stop [were] completed, there is no doubt that the officer[s] [could] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Bailey*, 302 F.3d 652, 657–58 (6th Cir. 2002) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)).

Thus ends the parties' agreement. Klare's position is that Harris failed to raise before the district court whether the continued detention was justified at the time Klare searched her, and thereby forfeited her right to press that issue before this court. Klare also contends that, regardless of whether Harris forfeited this argument, the presence of tools, in conjunction with the apparent obfuscation of the license plate and Harris's mother's other traffic violations, created the reasonable suspicion that the vehicle was involved with the drug trade, thus justifying the continued detention of Harris and her family. Harris disagrees, asserting that she did raise the issue before the district court and that the above-listed facts were insufficient to create a reasonable suspicion of drug activity.

### 1. Forfeiture

"Ordinarily an appellate court does not give consideration to issues not raised below." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941). This reticence to consider unraised issues is born of the need "to ease appellate review by ensuring that district courts consider issues first, and to prevent surprise to litigants." *Great Am. Ins. Co. v. E.L. Bailey & Co.*, 841 F.3d 439, 443 (6th Cir. 2016). This rule is not absolute, however, and it is within the ambit of our discretion to entertain questions not raised below. *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 544–45 (6th Cir. 1996).

In the matter *sub judice*, Klare moved for summary judgment, arguing that Harris had consented to the search. Harris filed a memorandum in opposition to that motion, arguing that her consent was invalid because she was seized without reasonable suspicion that she was engaged in illegal activity. Harris did not, however, explain why she believed the officers lacked reasonable suspicion. Nor did she make clear whether her position was that they had always lacked reasonable suspicion of criminal activity or whether the reasonable suspicion had dissipated by the time of the search. But the district court, in granting Klare's motion for summary judgement, did find that "the stop was prolonged by the officers' reasonable suspicion of drug activity due to the presence of Harris's father's tools and equipment in the car" and that Harris was therefore lawfully seized. Based on this finding, we conclude that Harris's general argument below that she was illegally seized at the time of the search provided sufficient notice to Klare that Harris challenged the existence of reasonable suspicion to believe that the Harris family was involved in drug activity. We will therefore proceed to the district court's holding that Harris was legally seized at the time of the search.

## 2. *Reasonable Suspicion*

Because the purpose of the initial traffic stop was completed with the arrest of Harris's mother, the continued seizure of Harris was legal only if the officers had developed a reasonable suspicion of some other criminal activity. *Bailey*, 302 F.3d at 657–58. "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Ellis*, 497 F.3d 606, 612–13 (6th Cir. 2007) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). Klare's position is that the presence of tools, in conjunction with the apparent obfuscation of the license plate and Harris's mother having driven a vehicle without insurance and with a suspended license, created a reasonable suspicion that the vehicle was involved with the drug trade.

We have serious doubts as to whether the officers reasonably suspected the Harris family of manufacturing or transporting contraband. Klare provides no reason to suppose that Harris's mother's alleged traffic violations made it more likely that drug activity was afoot—if anything, one would expect a drug-trafficking family to avoid fastidiously such violations for fear of

discovery. *See, e.g.*, *United States v. Urrieta*, 520 F.3d 569, 575 (6th Cir. 2008) (holding that the defendant's driving with an expired registration was "largely irrelevant to the determination [that he] was a drug courier").

Nor does Klare explain how the possession of worker's tools, which is not itself "inherently illegal or even suspicious," could have provided the officers with a reason to suspect drug activity. *See United States v. Warfield*, 727 F. App'x 182, 188–89 (6th Cir. 2018) (holding that the possession of eight cartons of cigarettes was not suggestive of the possession of untaxed cigarettes). The record contains no reason to believe that screwdrivers and wrenches—or any of the other tools in the vehicle—are particularly indicative of drug manufacture or transportation.

Regardless, even if the officers reasonably suspected the Harris family of being engaged in the drug trade, "[o]nce the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions . . . were dispelled." *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005). The failure of a drug dog to alert may not always dispel probable cause, but it dispels mere reasonable suspicion absent some reason to question the reliability of the drug dog. *Id.*; *see also United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006) (holding that a drug dog's failure to alert did not dispel reasonable suspicion when officers knew that duffel bags they suspected of containing drugs had recently been placed in a vehicle and that therefore any odor would not have had time to permeate the vehicle).

Because a reasonable jury could credit Harris's deposition testimony that she was not escorted to the restroom until after the drug dog had investigated the minivan, a reasonable jury could conclude that the officers did not reasonably suspect drug activity at the time of her search and that therefore she was unlawfully detained, rendering her consent to the search invalid.

### 3. Qualified Immunity

The existence of a jury question as to the legality of Harris's seizure does not end the inquiry, however, because Klare claims qualified immunity. "In determining whether qualified immunity applies, [the court] employ[s] a two-part test, asking (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir.

2009) (alterations in original) (quoting *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008)). "When . . . a defendant raises qualified immunity as a defense . . . [t]he plaintiff has the burden of showing that a right is clearly established . . . [and] the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time." *Everson*, 556 F.3d at 494 (citations omitted). In satisfying this burden, a defendant can rely on a reasonable mistake of fact, for "[q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

As Klare does not contest, the law is clear that once the original purpose of a traffic stop is completed, the investigative detention of a passenger is unconstitutional absent continuing reasonable suspicion of criminal activity. *See Bailey*, 302 F.3d at 657–58. Klare does argue, however, that she was unaware that the drug dog search had been completed and disclosed no drugs. Because officers are protected from liability for violations based on reasonable mistakes of fact, when an officer, "acting in good faith and in reliance on the reports of other officers, ha[s] a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under the totality of the circumstances." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007). Therefore, although a reasonable jury could find that Harris's clearly established constitutional rights were violated, Klare would still be protected by qualified immunity if no reasonable jury could find that she was aware of the lack of reasonable suspicion at the time of the search.

The parties agree that Klare was summoned to the scene after the initial stop and after the decision to summon the drug dog had been made by other officers, and Harris has presented no evidence that Klare actively participated in the investigation of the minivan. The question here, then, is whether a reasonable jury could infer that after arriving at the scene, Klare became aware that there was, at most, only a reasonable suspicion of drug activity and that she also became aware that the drug dog had failed to alert on the minivan prior to her search of Harris. Only if no reasonable jury could find that Klare knew both of these facts prior to the search is she protected by qualified immunity. Factual determinations of this sort are generally best left to the jury, and so it is here.

Klare's uncontroverted deposition testimony was that when she arrived at the scene, she spoke with other officers about "their investigation" and that, although she could not remember specifically what the officers told her, they had said that "they had seen some things that they believed could be consistent with the possibility of a meth lab or some other drug activity." Given that Klare was at least aware that the suspicion was based on having seen items in the minivan, and that she was in the vicinity of the minivan and the investigating officers, a reasonable jury could infer that she became aware of the basis of the suspicion, either by viewing the minivan herself or through discussion with the investigating officers.

Nor can we say that a reasonable jury could not infer that Klare knew that the drug dog had failed to alert to the presence of contraband. Although the record contains no direct evidence regarding whether Klare observed the drug dog's inspection of the vehicle or was informed as to the results upon its conclusion, it does reveal that the relevant events all occurred within a small area and that Klare was within that area. The alerting of a drug dog to contraband, or the lack thereof, is an easily observable act in which Klare would have been quite interested, and a reasonable jury could infer that, standing nearby as she was, Klare observed the drug dog's activity.

We conclude therefore that there is a sufficient factual basis on which a reasonable jury could find that Klare is unprotected by qualified immunity. Although the facts are disputed, Harris has sufficient proof from which a reasonable jury could find that at the time of the search, Klare did, in fact, know that the drug-dog's sniffing was completed, that the search of the minivan had failed to indicate the presence of any drugs, and that there was no other lawful basis to detain Harris.

## B. The Search

Harris's alternative basis for challenging the reasonableness of the search is that the consent itself was not "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion." *Beauchamp*, 659 F.3d at 571. So we next address whether there is sufficient evidence from which a reasonable jury could find that the search of Harris was unlawful because her consent was not given voluntarily.

*1. The Voluntariness of the Search*

Generally, a judicially issued warrant is required to conduct a search. *Andrews v. Hickman Cty.*, 700 F.3d 845, 854 (6th Cir. 2012). If an officer argues that she performed a search pursuant to an exception to the warrant requirement, the burden is on her to establish that such an exception applies. *Id*. Klare therefore has the burden to prove the exception here—that is, valid consent to her search.

Whether Harris's consent was voluntarily given is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). That consent was "freely and voluntarily given . . . must be proven by 'clear and positive' proof." *United States v. Kelly*, 913 F.2d 261, 265 (6th Cir. 1990) (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). Klare's burden to show that Harris consented freely and voluntarily "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

In determining whether Harris's consent was free and voluntary, or mere acquiescence, we look to several factors that fall into two general categories. First, we "examine the characteristics" of the consenter, including "age, intelligence, and education," as well as "whether the individual understands the right to refuse to consent . . . and whether the individual understands his or her constitutional rights." *Ivy*, 165 F.3d at 402. Second, we examine the characteristics "of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw [an individual's] judgment." *Id.* (alteration in original) (citations omitted).

Although not strictly a characteristic of either Harris or the detention, the nature of the consent itself is material and must therefore also be considered. Consent to a search need not be verbal—acts and gestures can suffice to show consent. *United States v. Drayton*, 536 U.S. 194, 199–200 (2002) (holding that defendant consented to a search by "lifting his hands about eight inches from his legs" after being asked "Mind if I check you?"). And non-verbal actions are legitimately considered by fact-finders when determining whether consent was given. *United*

*States v. Chambers*, 646 F. App'x 445, 448 (6th Cir. 2016) (mem.) (holding that the defendant's placing "his hands on the troopers' vehicle . . . could be viewed as further evidence of consent").

### a. Characteristics of Harris

Some of Harris's characteristics are neutral, giving us no reason to believe that she was particularly susceptible to police coercion or that she was particularly resistant. Her education, which extended as far as a high-school diploma, but no further, is not outside the norm. *See, e.g.*, *United States v. Jones*, 846 F.2d 358, 360–61 (6th Cir. 1988) (considering the possession of "*no* formal education" as a factor weighing against finding voluntary consent). Nor do we have any reason to doubt Harris's intelligence.

Harris's age, on the other hand, counsels against finding voluntary consent. Although her age at the time of the search is not dispositive, it is "beyond dispute that children will often feel bound to submit to police."[5] *J.D.B. v. North Carolina*, 564 U.S. 261, 264 (2011). This is particularly true when a minor like Harris, who had never even spoken with a police officer prior to the events in question, is "a newcomer to the law." *United States v. Crowder*, 62 F.3d 782, 788 (6th Cir. 1995) (considering the extent of a defendant's prior exposure to law enforcement as a factor in determining whether he had given consent to a search).

Most importantly, we have good reason to believe that Harris was unaware of her right to refuse to be searched. *United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980) ("Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, such knowledge [is] highly relevant to the determination" of whether consent was voluntarily given. (citation omitted)). Neither Klare, nor any of the other officers, explained this right to Harris, and Harris testified that she "didn't know that [she] was able to consent" to the search because Klare asserted that she may need to search Harris, without asking whether she consented or telling her that she could refuse.

Klare argues that the officers' having asked Harris's father's permission for her to be escorted to the restroom imparted to Harris the knowledge that she could refuse the search. But

---

[5]Recognition of Harris's youth undoubtedly explains why the officers asked her father, and not the girl herself, if it was permissible for Klare to escort her to the restroom.

this suggests only that her father could refuse to have her escorted to the restroom, not that Harris herself could refuse to be searched. Nor does it suggest that, once her father had consented to her being escorted, Harris personally retained any right to revoke that consent.

Klare also argues that because she said, "would you step over here," Harris knew that she had the right to refuse to be searched. In the context of their walking to the restroom, Klare asserts, we ought to interpret her saying "would you step over here" as a request for Harris to facilitate a search of her person. That it was a request suggests that it could be refused, meaning that Harris would know she could refuse the search.

There are two reasons why this argument is unconvincing. First, even if a reasonable jury could conclude that Harris knew that "would you step over here" was a precursor to a search, it could also find the opposite. When Klare said "would you step over here," Harris had no reason to believe that it was related to an impending search other than the fact that she had earlier been told that officers *may* have to search her; as she later testified, she "didn't even know that there was going [to] be a search when I walked over there." If Harris was unaware that the statement "would you step over here" was uttered for the purpose of facilitating a search, that utterance could hardly impart to her the knowledge that she had the right to refuse consent to that search.

Whether or not Harris knew that Klare made the statement for the purposes of a search, a reasonable jury could find that the statement was a command, not a request. *See United States v. Cowan* 704 F. App'x 519, 527–28 (6th Cir. 2017) (Moore, J., dissenting) ("The difference between asking in the first instance whether an individual consents to a search and asking whether an individual can take an action that will facilitate a search is the difference between a request that can be freely declined and a command that cannot."). It would have been reasonable for Harris to interpret the phrase "would you step over here" as a command, particularly given that it was being uttered by an officer whose control she was under. If she interpreted the statement as a command, it cannot be used as evidence that she knew she had a right to refuse consent to the impending search.

b.  Characteristics of the detention

The characteristics of the detention also weigh against finding that Harris consented to Klare's search.  That there were six police vehicles, and their attendant officers, at the scene, contributed to "establish[ing] a custodial atmosphere and coercive environment."**6**  *Jones*, 846 F.2d at 361 (considering the presence of three police vehicles as indicative of involuntariness).  Although the fact that the officers were armed does not, by itself, make it more likely that Harris's consent was involuntary, the fact that Klare repeatedly touched her weapon, which was semi-unholstered, gave Harris some cause to believe she could not refuse to be searched.  *Drayton*, 536 U.S. at 205 ("The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").

Yet Harris was held for over an hour before the search, and "the length of detention before consent is a significant factor in any voluntariness determination."  *Ivy*, 165 F.3d at 402 (considering the passage of approximately one-and-one-half hours between the seizure and the consent as indicative of involuntariness).  The length of the detention is particularly significant in light of the implicitly conditional nature of Klare's offer to escort Harris to the restroom.  As Klare's deposition testimony shows, had Harris refused her consent to Klare's search, she would not have been allowed to go to the restroom.  As anyone who has found themselves waiting in line for the cinema restroom at the conclusion of a movie can attest, forcing someone who has been in custody for over an hour to choose between consenting to a search and going to the restroom is one way to "apply pressure" and "intensify[] the coercive tenor of the request for consent." *Id*. at 403.

Finally, before searching her, Klare used her own hand to secure Harris's hands behind her back.  Although it is true that "just because a defendant is handcuffed when he or she gives consent does not make such consent invalid," *United States v. Lee*, 793 F.3d 680, 686 (6th Cir. 2015), it is equally true that a "defenseless [girl] is not in a position to say no to a police officer whose hands are still on or just removed from [her] body while another officer is standing just a few feet away." *Beauchamp*, 659 F.3d at 572.

---

**6**Harris alleges that while waiting for the drug dog, her father asked why there were six police cruisers and numerous officers at the scene and was told that "[w]e [are] bored, it's Thursday, we [have] nothing to do."

c. <u>Weight of the factors</u>

A reasonable jury, considering the nature of Harris, her consent, and her detention, could find that Harris's consent was not voluntarily given.  The record would support a jury in finding that she did not verbally consent to be searched and that her consent, such as it was, consisted solely in walking towards Klare, as instructed, and her lack of resistance to the actual search. When a minor, untutored in her Fourth Amendment rights, seized for over an hour and in the presence of numerous armed police officers, with her arms secured behind her back and facing the choice of consenting to a search or being kept from the restroom, fails to resist that officer's search of her person, a reasonable jury could find that this non-verbal consent was not voluntarily given.

### 2.  *Qualified Immunity*

That a reasonable jury could find that Harris's consent was involuntary does not entail, of course, that a reasonable jury could find that no reasonable officer in Klare's position could be mistaken about that fact.  *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012))).  As noted, Harris was seventeen, but a reasonable officer in Klare's position may have been unaware that she was a minor.  And the record is unclear as to how long Klare had been at the scene—she may have been unaware of precisely how long Harris had been seized.  Excising those facts about which Klare could have reasonably been mistaken, we must determine whether a reasonable jury could find that "any reasonable [officer] in the defendant's shoes would have understood that [s]he was violating" Harris's right to be free of unreasonable searches.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

To answer this question we must determine whether "the law at the time of the conduct" provided Klare with "fair notice that her conduct was unlawful."  *Brosseau v Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  Because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts" in cases

implicating the Fourth Amendment, Klare can only be denied qualified immunity if there is controlling precedent involving materially similar facts in which courts have found consent to be involuntarily given. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

In *United States v. Beauchamp*, an officer parked his patrol car near a suspect, exited his vehicle, and instructed the suspect to stop walking, which he did. 659 F.3d at 564. The officer then instructed the suspect to walk towards the officer, an instruction that was also followed. *Id*. Once the suspect approached, the officer noticed that he was "very nervous, visibly shaking, wide-eyed, and scared." *Id.* (quotation marks omitted). Another officer arrived on the scene and the original officer, while frisking the suspect, asked for consent to perform a full search, which the suspect granted. *Id.* at 565. Although the officers on the scene did not know this, the suspect had interacted with the police earlier in the day, having "hurriedly walked away" from officers "without making eye contact." *Id*. at 564. Noting the suspect's earlier interaction with the police, and that he had never been informed of his right to refuse to consent to the search, this court found that the suspect's consent was not voluntarily given. *Id*. at 572. Particularly significant was that the consent was given to an officer who had already begun to frisk the suspect while another officer witnessed the encounter. *Id*.

There are important similarities between the facts in *Beauchamp* and here. In both cases, the officer's hands were on the suspect before consent was given to the search. Also, other police officers were on the scene. And like the suspect in *Beauchamp*, Harris had experienced recent interaction with law enforcement: Harris had spent the past hour observing and interacting with the police—watching her mother's arrest and her family's detention. And Harris, like the suspect in *Beauchamp*, was not told by the police that she had the right to refuse the search.

Of course, the facts between the two cases do differ. In *Beauchamp*, the suspect was visibly distraught, although there is no evidence that Harris was outwardly anything but calm during the encounter. Although an individual's outward demeanor is certainly a factor to be weighed when determining whether that individual has consented to a search, it has never been held to be a necessary factor.

Other than that distinction, the factual differences between this case and *Beauchamp* make it more likely, not less, that Harris's consent was involuntary. Most importantly, the suspect in *Beauchamp* verbally consented, whereas Harris's consent consisted merely in walking to a location to which she had been directed and not resisting while she was searched. Whereas the suspect in *Beauchamp* was being frisked when he gave consent, Harris was being restrained. Whereas the suspect in *Beauchamp* had been seized briefly, Harris had been seized for over an hour. And whereas the suspect in *Beauchamp* was in the presence of only two officers, six squad cars were on the scene when Harris was searched.

That the facts surrounding Klare's search of Harris do not precisely match those in *Beauchamp* does not prevent our holding that a reasonable jury could find that Klare is unprotected by qualified immunity. Police officers are sometimes "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," and we must adjudge those decisions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted). But the situation in which Harris and Klare found themselves was neither tense, nor uncertain, nor rapidly evolving, and we ought not require a jury to be overly deferential to the decisions made by Klare that day. Because a reasonable jury could credit Harris's account of events, they could find that Klare unreasonably searched her without her voluntary consent and that Klare is not entitled to qualified immunity.

**III**

For the foregoing reasons, we **REVERSE**.