**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0617n.06

Case Nos. 19-1496/1498/2050

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Oct 30, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| DAVID GARCIA, MIGUEL GARCIA, and | ) | DISTRICT OF MICHIGAN |
| JAVIER ROBLES, | ) | |
| | ) | |
| Defendants-Appellants. | ) | **O P I N I O N** |

---

**BEFORE: McKEAGUE, GRIFFIN, and BUSH, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Javier Robles, and his nephews, David Garcia and Miguel Garcia, were convicted of conspiracy to possess with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Miguel and Robles were also convicted of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956.

David and Robles appeal the district court's denial of their motion to suppress the evidence allegedly tainted by an illegal search. Individually, David challenges the sufficiency of the evidence supporting his drug conspiracy conviction and, in the alternative, argues that while the indictment charged him with participating in a single conspiracy, the evidence at trial revealed the existence of two separate conspiracies, resulting in a variance between the charged and proven conspiracies. Miguel contests the district court's denial of his motion to suppress based on his assertion that he did not give voluntary consent to the search, the court's acceptance of an

inconsistent jury verdict, and the court's calculation of the laundered funds attributable to him. Robles's only additional argument on appeal is that the district court erred in calculating the total amount of drugs attributable to him.

Finding no error in the district court's decisions, we **AFFIRM**.

## I. Background

The Detroit Drug Enforcement Administration (DEA) began investigating drug trafficking activity in Detroit in June 2015. The DEA learned that a local drug dealer who dealt kilogram levels of heroin in the Detroit area, Edward Foster, was receiving his supply from Robles, who would send him heroin from California via USPS. In November 2016, Detroit DEA agents arrested Kenny Spencer, another local drug dealer, who told agents that he had just received a package from Robles containing a kilogram of heroin. Agents seized the package from Spencer's residence and found 800 grams of heroin.

DEA agents obtained a search warrant for Robles's phone's real-time location data, which showed the phone at what was later confirmed to be Robles's home, 835 Sunset Avenue in Pasadena, California. Agents reviewed data from Robles's phone and found that he had sent Miguel Garcia's name and bank account information to Foster. Agents then learned that the Detroit police had seized $25,000 from Miguel in Detroit in February 2015. That seizure occurred when Detroit police officers received a tip that a California drug dealer was staying at the America's Best Value Inn, outside of Detroit in Dearborn, Michigan. Officers saw a man later identified to be Miguel arrive at the hotel with a bag that was "squared off at the bottom," which was significant because bulk currency is often shaped into a square or rectangle. Later that day, Miguel left the hotel with the bag and took a cab to a Bank of America branch, used the ATM in the lobby, then took the cab to a different Bank of America branch. The officers suspected Miguel

was "structuring" by making small deposits at different ATMs, a tactic often used by drug traffickers, so they conducted a traffic stop. When Miguel got out of the cab, officers saw rolls of money sticking out of his pockets. Officers asked Miguel if he had any weapons or anything illegal on him, and Miguel replied "no." Officers then asked Miguel if they could search him "for everyone's safety," and he said "yes." Officers searched Miguel and found nine rolls of cash totaling $25,000.

On November 14, 2016, Detroit DEA agents flew to Pasadena to arrest Robles and execute search warrants at his personal residence, 835/837 Sunset, and what was believed to be his "stash house" at 2094/2096 Fair Oaks, where David also lived. Robles told agents that he was a "middle man" who sold kilograms of heroin to dealers in Detroit through USPS, including Foster and Spencer, and used Bank of America accounts to collect his money. Agents also arrested David who, at the direction of Robles, sold 1.36 kilograms of methamphetamine to coconspirator Darius Cooper. At the Fair Oaks stash house, agents found approximately 6.1 kilograms of methamphetamine. In David's bedroom at the Fair Oaks house, agents recovered two drug scales and multiple small bags of methamphetamine, heroin, and cocaine packaged for distribution.

On the same day they arrived in Pasadena, before the Detroit DEA agents arrested Robles and David and executed the search warrants, the agents discovered that Homeland Security Investigations (HSI) went to 835/837 Sunset in June 2016 and seized a large amount of narcotics from the residence. The Detroit agents used this information, that HSI had recovered drugs from Sunset a few months ago, in their probable-cause statement for the Sunset and Fair Oaks warrants.

Two years later, in preparation for trial in July 2018, a Detroit DEA agent spoke with an HSI agent who was involved in the June 2016 seizure. The DEA agent learned that HSI had discovered Robles was involved in drug trafficking from an illegal state wiretap, the "Riverside

wiretap." While the government did not concede that the Riverside wiretap was illegal, it agreed not to present any evidence at trial that was derived from the wiretap, including the drugs HSI seized in 2016 and two packages seized by USPS in 2015. Defendants argued that because the Sunset and Fair Oaks probable cause affidavits contained information from the Riverside wiretap—the 2016 HSI drug seizure—to support the application for warrants, all evidence seized from the Sunset and Fair Oaks residences must be suppressed.

The district court held a four-day suppression hearing during which it excluded evidence of the 2016 HSI seizure and the USPS packages, but found the rest of the government's evidence admissible under the independent-source doctrine. The district court found that the Sunset and Fair Oaks affidavits still contained probable cause even when omitting the information that HSI seized drugs from the Sunset residence in 2016.

At trial, the jury found David, Miguel, and Robles guilty of conspiracy to possess with intent to distribute and distribution of controlled substances. Additionally, the jury found Robles and Miguel guilty of conspiracy to launder money.

This appeal followed.

## II. Discussion

### A. *Suppression: Independent Source*

David and Robles challenge the district court's denial of their motion to suppress the evidence connected to the Riverside wiretap. Their argument is twofold: (1) all the evidence obtained through the Sunset and Fair Oaks search warrants should have been suppressed because it originally stemmed from the Riverside wiretap and (2) the Sunset and Fair Oaks search warrants are invalid because when the tainted information is removed from the affidavits—the drugs HSI seized in 2016 and two packages seized by USPS in 2015—they lack probable cause.

Defendants waived these arguments by conceding, during the suppression hearing, that there was no additional evidence that needed to be suppressed besides what the government had already agreed to exclude, and that when the two pieces of the Riverside wiretap-derived evidence were removed from the Sunset and Fair Oaks affidavits, probable cause still existed. *See United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). However, even assuming that Defendants have not waived these arguments, they still fail on the merits.

When reviewing a district court's ruling on a motion to suppress, this Court reviews "findings of fact for clear error and conclusions of law de novo." *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (quoting *United States v. See,* 574 F.3d 309, 313 (6th Cir. 2009)). When the district court has denied a motion to suppress, this Court reviews the evidence in the light most likely to support the district court's decision. *Id.*

Under the independent-source doctrine, evidence can be admitted if it was discovered by means "wholly independent of any constitutional violation." *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996)). A court must decide whether, given the illegality of the primary source, the evidence has been discovered "by the exploitation of the illegality or instead by [independent] means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996)). "If the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies . . . .'" *United States v. Chapman-Sexton*, 758 F. App'x 437, 441 (6th Cir. 2018) (quoting *Jenkins*, 396 F.3d at 758), *cert. denied*, 139 S. Ct. 2731 (2019).

At the suppression hearing, the court found that the Detroit DEA did not use any of the Riverside wiretap information in their investigation. The court credited the testimony of several

agents that they did not learn about the Riverside wiretap until July 2015, after they had already arrested Foster and used his phone to identify his source of supply as Robles. The court found that the agents discovered Robles's Fair Oaks and Sunset properties from a confidential source, who told them that a man named Hernandez Milan got his supply from Robles. Agents corroborated this information by setting up a controlled buy with Milan, whom they observed leave the Fair Oaks property and sell half a pound of crystal methamphetamine to the confidential source. The court also found that the DEA learned about the Sunset residence through Spencer, who told agents that he had been to the property with Robles and was expecting another shipment of drugs from there shortly.

According great deference to the district court's credibility determinations, as this Court must, *see United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008), the district court did not clearly err in finding that the Detroit DEA agents did not use the Riverside wiretap in their investigation. Looking at the totality of the circumstances, the district court was also correct in determining that the Sunset and Fair Oaks warrants were supported by probable cause, even when the tainted information is excised.[1]

*B. Suppression: Consent*

Miguel argues that the district court erred in denying his motion to suppress $25,000 in cash seized from his person on February 21, 2015 in the Bank of America parking lot because he did not voluntarily consent to the search, and even if he did, the search exceeded the scope of his

---

[1] David also makes a cursory attempt at bringing an ineffective assistance of counsel claim based on his trial attorney's decision to concede the adequacy of the Sunset and Fair Oaks affidavits after removing the information derived from the Riverside wiretap. This Court does not generally review claims of ineffective assistance on direct review, and there is no reason to do so here. *See United States v. Lewis*, 605 F.3d 395, 400 (6th Cir. 2010). The record does not contain information pertaining to trial counsel's preparation, strategy, or communication with David, so this Court does not have the facts necessary to decide whether counsel was ineffective. *See United States v. Bradley*, 400 F.3d 459, 461–62 (6th Cir. 2005).

consent. Whether consent was valid is a question of fact reviewed for clear error. *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015).

Police may conduct a warrantless search if "valid consent to search is given." *United States v. Chambers*, 646 F. App'x 445, 447 (6th Cir. 2016) (quoting *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011)). Valid consent is "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion." *Cochrane*, 702 F.3d at 342 (quoting *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)). In determining if consent was valid, this Court considers "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Chambers*, 646 F. App'x at 447–48 (quoting *Worley*, 193 F.3d at 386). "No one factor is determinative." *Id.* at 448.

The district court did not clearly err in its analysis. It found Miguel's consent was valid and that there was no evidence of any coercion. The court cited to and considered the *Cochrane* factors listed above and determined that although Miguel was only 19, was visibly nervous, did not have a college degree, and did not necessarily demonstrate an understanding of his right to refuse consent, other factors made it clear that his consent was voluntary. In particular, the court noted that Miguel was studying for his GED, understood English, was not under the influence of drugs, alcohol, or medications, and did not have medical or mental issues that would have affected his consent. The court also found that Miguel was only approached by two officers who never drew their weapons, contrary to defense counsel's argument that Miguel was "accosted by a phalanx of armed agents." *See Chambers*, 646 F. App'x at 448–49 (upholding a finding of voluntary consent despite the presence of uniformed officers with "guns visible" and the fact that

the defendant was nervous). Lastly, the court considered the fact that the officers requested Miguel's consent to search shortly after they stopped him, and therefore Miguel was not worn down by the officers. *See Harris v. Klare*, 902 F.3d 630, 641 (6th Cir. 2018) (finding the fact that the defendant was held for over an hour before she consented to the search to weigh in favor of involuntariness).

Miguel next argues, for the first time on appeal, that the extent of the search exceeded the scope of his consent. Because Miguel did not raise this issue before the district court, it is reviewed only for plain error. *See United States v. Ramamoorthy*, 949 F.3d 955, 960 (6th Cir. 2020). This Court reverses for plain error "only in exceptional circumstances and only where the error is so plain that the trial judge . . . [was] derelict in countenancing it." *United States v. Fuller-Ragland*, 931 F.3d 456, 459 (6th Cir. 2019) (quoting *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994)).

Miguel claims that because officers asked him if he had weapons or anything illegal on his person and then asked to search him "so everyone could stay safe," the seizure of the $25,000 was outside the scope of his consent. This argument has no merit. "When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997). The standard for assessing the scope of the consent given is objective reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

In this case, Miguel's statement of "yes" in response to the request to search did not limit his consent in any way. It was entirely reasonable for the officer to believe that consent to search someone's person for weapons or anything illegal would include his or her pockets. *See United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) (holding that an officer who obtained

defendant's unconditional consent to search his vehicle did not exceed the scope of consent by searching and seizing narcotics in the vehicle's gas tank). The district court did not plainly err by failing to conclude that the search of Miguel's person exceeded the scope of his consent.

## C. Inconsistent Jury Verdict

The jury found Miguel guilty of conspiracy to possess with intent to distribute and distribution of a controlled substance. In its special verdict, the jury attributed at least 1 kilogram of heroin, 400 grams or more of fentanyl, and 500 grams or more of methamphetamine to Robles; 500 grams or more of methamphetamine to David; and no amount of controlled substances to Miguel. Miguel argues that the jury's verdict must be vacated because the jury could not have found him guilty of the conspiracy while simultaneously determining that he did not possess or distribute any of the charged drugs. Because Miguel did not raise this issue before the district court, this Court reviews for plain error. *Ramamoorthy*, 949 F.3d at 960.

To sustain a conviction for a drug-trafficking conspiracy, "the government must have proved (1) an agreement to violate drug laws . . . ; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Randolph*, 794 F.3d 602, 608 (6th Cir. 2015) (quoting *United States v. Martinez,* 430 F.3d 317, 330 (6th Cir. 2005)). An agreement to violate the drug laws need not be "express or formal," *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006), and a "tacit or mutual understanding among the parties is sufficient," *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994) (per curiam), but the evidence must at least "demonstrate that the defendant had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object." *Caver*, 470 F.3d at 233 (citing *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). Once the existence of a conspiracy is proven,

however, "the evidence linking an individual defendant to that conspiracy need only be slight."

*Id.*

Miguel did not need to possess or distribute controlled substances to be guilty of a drug-trafficking conspiracy.[2] *See United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001) ("[I]t is possible to conspire to commit these drug offenses [possession, possession with intent to distribute and distribution] without actually committing the offense themselves; thus it is not impossible to commit the greater offense (conspiracy) without committing the suggested lesser offenses." (quoting *United States v. Horn*, 946 F.2d 738, 745 (10th Cir. 1991))).

Even though Miguel did not personally possess or distribute any of the drugs involved in the conspiracy, he was an essential member of the organization. Without someone to facilitate the financial dealings of the organization, the organization would not have profited. This Court has held that "money laundering is an act integrally related to the success of a conspiracy to distribute drugs." *United States v. Ross*, 190 F.3d 446, 450 (6th Cir. 1999) (citing *United States v. Todd*, 920 F.2d 399, 406 (6th Cir. 1990)). And while money laundering alone "is not sufficient to link a person who launders money with a conspiracy to violate drug laws," *id.*, Miguel's other actions, such as traveling to Detroit to deposit drug proceeds and allowing other coconspirators to deposit into and withdraw drug proceeds from his bank account, provide a "sufficient link" between his

---

[2] Miguel's relies on this Court's decision in *Randolph* for the proposition that the jury must attribute some amount of drugs to him in order for him to be convicted of a drug-trafficking conspiracy. We are not persuaded. In *Randolph*, we reversed the defendant's drug-trafficking-conspiracy conviction because the jury found that there were no drugs involved in the conspiracy *at all*, reasoning that "[f]or the jury to find [the defendant] guilty of the drug conspiracy, an essential element the government was required to prove beyond a reasonable doubt was that the drugs charged in the indictment were 'involved in' the conspiracy." 794 F.3d at 612. In contrast, here, the jury found beyond a reasonable doubt that the drugs charged in the indictment were involved in the conspiracy: 1 kilogram of heroin, 400 grams of fentanyl, and 500 grams of methamphetamine.

money laundering and the drug-distribution conspiracy to establish his participation in the conspiracy. *See id.* (quoting *United States v. Dela Espriella*, 781 F.2d 1432, 1436 (9th Cir. 1986)).

The district court did not commit plain error in accepting the jury's verdict.

### D. Sufficiency of the Evidence

David contends that there was insufficient evidence to convict him of the drug conspiracy because the jury did not attribute any amount of heroin to him and because he merely had a buyer–seller relationship with Robles.

In assessing sufficiency of the evidence, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The evidence of David's conduct was more than sufficient for a jury to find he knowingly joined the conspiracy. *See Randolph* 794 F.3d at 608. Agents recovered two drug scales and multiple bags of methamphetamine, heroin, and cocaine packaged for distribution in David's bedroom. At the direction of Robles, David collected drug money around Pasadena for Robles and sold methamphetamine locally to Cooper. Notably, during trial, the government put forth evidence of the methamphetamine that Robles directed David to sell to Cooper. Spencer then testified that this methamphetamine was "the exact same stuff" Robles sold to him to distribute in Detroit.

While David is correct in noting that a buyer–seller relationship alone does not establish a conspiracy, evidence of repeat purchases and large volumes of narcotics can create an inference of conspiracy. *See, e.g.*, *Gunter*, 551 F.3d at 482–83; *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003); *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir. 1986) (finding that one

kilogram of cocaine was a large volume), *aff'd*, 483 U.S. 171 (1987). David was not merely Robles's customer. David acted at the direction of Robles by selling methamphetamine and collecting drug money on his behalf, demonstrating an agreement to participate in the conspiracy. Further, the sheer quantity of methamphetamine that was attributed to David is sufficient to support an inference of conspiracy. He sold 1.36 kilograms of methamphetamine to Cooper and a search of his bedroom at the Fair Oaks residence revealed several packages of drugs ready for distribution.

Therefore, the evidence is sufficient to support the jury's verdict.

### E. Variance

David argues that because the indictment charged him with participating in one conspiracy, but the evidence at trial disclosed the existence of two, separate drug trafficking operations, a variance must have occurred and his conviction must be overturned. Because David did not raise this issue before the district court, this Court reviews for plain error. *Ramamoorthy*, 949 F.3d at 960. To prevail, David must show a clear or obvious error that affected his substantial rights and affected the outcome of the district court proceedings. *See United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).

A variance occurs "when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* (quoting *Caver*, 470 F.3d at 235–37). It exists if "the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Soto*, 794 F.3d 635, 659 (6th Cir. 2015) (quoting *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013)). In making this determination, the evidence must be viewed in the light most favorable to the government. *Caver*, 470 F.3d at 236.

David argues that there were two separate conspiracies. First, there was the operation involving Robles in California who sold heroin to Foster and Spencer in Michigan. The second operation involved Robles's distribution of methamphetamine at the local level in California, including to David. David claims that the admission of the evidence relating to Miguel's and Robles's participation in the Michigan conspiracy confused the jury, and therefore the jury overlooked the lack of evidence connecting David to the Michigan conspiracy.

We find his argument unpersuasive. "The principal considerations to determine the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Warman*, 578 F.3d 320, 341–42 (6th Cir. 2009) (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)). The evidence at trial proved that the goal of the conspiracy the government charged was to sell "dealer-level" amounts of heroin and methamphetamine to local dealers in California and Michigan. The nature of the scheme was the same in California and Michigan. Robles was the head of the organization who often directed Miguel to funnel money through his bank account and David to mail and sell controlled substances. For example, Cooper contacted Robles to set up a deal for 1.36 kilograms of methamphetamine. Robles then contacted David, who shortly after was seen leaving Robles's residence with a heavy plastic bag. Officers later recovered a white plastic bag with 1.36 kilograms of methamphetamine in Cooper's car. The participants of the deal overlapped as well. David sold drugs in California and via USPS in Michigan and Miguel funneled money in both California and Michigan.

Viewing the evidence in the light most favorable to the government, a jury could have found the existence of a single conspiracy.

*F. Sentencing: Quantity of Drugs*

The district court calculated Robles's base offense level at 36 based on a finding that he was responsible for 30,000 to 90,000 kilograms of converted drug weight.[3] This Court reviews a district court's drug-quantity determination for clear error. *United States v. McDonald*, 800 F. App'x 364, 367 (6th Cir. 2020). "The district court's decision must be upheld if it is plausible in light of the entire record." *Id.*

The court may make an estimate if the exact amount of drugs is undetermined, but that estimate must be supported by a preponderance of the evidence. *See United States v. Montgomery*, 787 F. App'x 272, 275 (6th Cir. 2019); *United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020). "In determining whether a district court's calculation of drug quantity is clearly erroneous, a key issue is the extent to which the court identified the evidence on which it relied in making that calculation." *United States v. Henley*, 360 F.3d 509, 515 (6th Cir. 2004). The court may rely on physical and testimonial evidence, "even where the testimony is given by a witness who may receive a reduced sentence in exchange for testifying." *Montgomery*, 787 F. App'x at 275. Moreover, if "there is no drug seizure or the amount seized does not reflect the scale of the offense," the court may rely on "the price generally obtained for the controlled substance, financial or other records, [or] similar transactions in controlled substances by the defendant." U.S.S.G. § 2D1.1 n.5.

---

[3] The government and Robles, in their briefing, and the probation officer in the Presentence Report, all refer to the total weight of the controlled substances attributable to Robles in terms of its "marijuana equivalence." The 2016 Sentencing Guidelines used marijuana equivalence as the rate of conversion, but the 2018 Guidelines amended the drug quantity table and refers to the total amount of drug weight as the "converted drug weight." *See* U.S.S.G. § 2D1.1. Because the probation officer noted in the Presentence Report that he was using the 2018 Guidelines, and the calculations are consistent with the 2018 Guidelines drug quantity table, we will assume the parties intended to refer to the converted drug weight and, for the sake of clarity, will use that term throughout.

The district court's findings were thorough and supported by the record. The court first credited coconspirator Spencer's testimony at trial that Robles mailed him between 35-to-40 kilograms of heroin, or 35,000 to 40,000 kilograms of converted drug weight. The court found it had "little reason to doubt this testimony," and this Court affords "great deference" to a district court's credibility determination. *See Jeross*, 521 F.3d at 570. In addition, the court cited several pieces of evidence that corroborated Spencer's testimony, including pictures found on Robles's cell phone of USPS receipts showing packages sent to addresses used by Spencer that were later determined to contain 7 kilograms of heroin; the heroin recovered at the time of Spencer's arrest that he purchased from Robles; and Robles's post-arrest statement that he sold one-to-two kilograms of heroin to people in Detroit, including Spencer.

While the court found that this evidence alone supported a finding that Robles conspired to distribute 30 kilograms of heroin by a preponderance of the evidence, the court also came to this conclusion by analyzing the financial evidence in the record. The court considered financial analyst Frank Scartozzi's testimony that more than $600,000 was deposited in Michigan and withdrawn in California; that law enforcement seized $25,000 from Miguel after he already deposited $10,000 in the bank; and that law enforcement seized two packages sent by Spencer that contained $80,000. That totals over $739,000 and amounts to 21.116 kilograms of heroin, or 21,116 kilograms of converted drug weight based on the rate of $35,000 per kilogram of heroin. The court also added in the 7 kilograms of methamphetamine, or 14,716 kilograms of converted drug weight, that law enforcement seized from David, for a total of 35,832 kilograms of converted drug weight.

The district court properly identified the particular evidence it relied on in making both its calculations, and the record supports the court's calculation. Therefore, the court's calculation was not clearly erroneous.

## G. Sentencing: Money Laundering

Miguel challenges the district court's calculation of his Guidelines sentencing range for his conspiracy-to-launder-monetary-instruments conviction based on the value of the laundered funds. This Court reviews the district court's factual determination as to the value of the laundered funds for clear error. *United States v. Macias Martinez*, 797 F. App'x 974, 980 (6th Cir. 2020).

The base offense level for a violation of 18 U.S.C. § 1956(a)(1)(A)(i) is eight plus the number of offense levels from the table in U.S.S.G. § 2B1.1, corresponding to the value of the laundered funds. *See* U.S.S.G. § 2S1.1(a)(2). The district court found that the value of the laundered funds attributable to Miguel was $123,020, increasing his offense level by eight because the offense involved more than $95,000 but less than $150,000, pursuant to § 2B1.1(b)(1)(E). The district court also found that Miguel knew the laundered funds were the proceeds of the distribution of a controlled substance, requiring a six-level increase under § 2S1.1(b)(1), and that, because he had been convicted under 18 U.S.C. § 1956, two levels were added pursuant to § 2S1.1(2)(B), for a total offense level of 24.

Miguel argues that he should have only been held responsible for $62,000 of the laundered funds because the other $61,340 was deposited into his account by other coconspirators. In determining the amount of loss attributable to a defendant pursuant to § 2B1.1(b), the district court may consider any "relevant conduct," which includes all acts of coconspirators that were within the scope and in furtherance of the jointly undertaken criminal activity, if those actions were

reasonably foreseeable. U.S.S.G. § 1B1.3(a); *United States v. Donadeo*, 910 F.3d 886, 894 (6th Cir. 2018).

Therefore, the value of the funds attributable to a defendant may include the amount that resulted from his criminal conduct as well as the amount that resulted from his coconspirators' conduct. *Donadeo*, 910 F.3d at 894 (citing *United States v. Kennedy*, 714 F.3d 951, 960–61 (6th Cir. 2013)). In finding coconspirator conduct attributable to a defendant, the district court must make a particularized finding with respect to both the scope of the criminal activity the defendant agreed to undertake and the foreseeability of his coconspirators' conduct. *See Kennedy*, 714 F.3d at 961 (citing *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002)).

The district court addressed both of these issues. The court explained that Miguel must have come to an agreement with his conspirators to launder drug-trafficking funds because he had to "provide [the bank] account details to other members of the [drug-trafficking organization] for them to make the deposits and withdraw the money himself or give his debit card to others to withdraw the money." And the court explained that because the account was in Miguel's name, he would have known what kind of activity was taking place, as he would have received statements or notifications from the bank.

The district court did not clearly err in finding Miguel agreed to allow other coconspirators to launder money through his bank account and finding that the amounts deposited were therefore reasonably foreseeable to him.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgments of the district court.