NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0181n.06

Case No. 24-1201

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MIKE POP,

    Plaintiff - Appellee,

v.

BROOKFIELD CHRYSLER DODGE JEEP, INC.,

    Defendant,

GREGORY GUNTHER; ANTHONY TURNER,

    Defendants - Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Apr 02, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

GIBBONS, J., delivered the opinion of the court in which GRIFFIN, J., concurred. CLAY, J. (pp. 18–28), delivered a separate dissenting opinion.

JULIA SMITH GIBBONS, Circuit Judge. This 42 U.S.C. § 1983 action alleging an unconstitutional search and seizure of plaintiff Mike Pop's Jeep arises out of a series of unfortunate actions during which Pop, despite having valid title to the vehicle, was forced to navigate a maze of government bureaucracy and police officers who all believed—incorrectly—that his Jeep was stolen. The sequence of events culminated when defendant Sheriff's deputies, Gregory Gunther and Anthony Turner, were dispatched to Pop's home where they persuaded Pop to consent to the surrender of the vehicle. Pop now alleges his consent was coerced, amounting to an unreasonable seizure of his vehicle. The district court denied the deputies' motion to dismiss on qualified immunity. Because the deputies are entitled to qualified immunity, we reverse.

I.

Brookfield Chrysler Dodge Jeep, Inc. sells cars to consumers using retail installment sales contracts (RISCs). Under a RISC, the car dealer obtains a consumer's credit report, then attempts to obtain conditional approval from an investment company to fund the deal and purchase the contract subject to the satisfaction of later additional terms (*e.g.*, verification of employment and income). When Brookfield receives conditional approval, it informs the customer that he or she has been approved for financing. Brookfield prepares the documents related to the transaction, the customer signs them, and then the customer takes ownership of the vehicle. But sometimes, a car dealership may later find itself unable to satisfy all the conditions, so the third-party investment company will refuse to honor its conditional agreement to buy the RISC. When this happens, the car dealer may then refuse to honor its contract with the consumer, sometimes known as a "spot delivery" or "yo-yo" transaction. The car dealer may then attempt to get the customer to provide more documents, sign additional contracts, or demand that the vehicle be returned.

In November 2021, Pop signed a RISC prepared and provided by Brookfield to buy a Jeep. The RISC contained no provision making its enforceability contingent on the sale or assignment of the RISC by Brookfield to any other third party. Brookfield transferred the title of the Jeep to Pop. Pop received certificate of title to the Jeep by mail with a listed issue date of November 26, 2021.

Initially, the state of the purchase seemed to be fine, and Pop was communicating with the dealership as normal, discussing various aspects of his ownership such as when he would pick up the license plate and how he would pay his monthly installments. His relationship with Brookfield quickly deteriorated, though, when in February 2022, the car dealership stated that it needed the Jeep back or they would file a "big case against" Pop. Pop did not return the Jeep and alleges, on

information and belief, that Brookfield was attempting to take the Jeep back because it could not sell his RISC to a third party.

Around April 2022, Brookfield contacted the Benton Township Police Department to make a stolen vehicle report concerning Pop's Jeep. Deputy Alex Povenz met with Andrew Beam and Austin Froberg from the Brookfield dealership. Pop alleges that Beam and Froberg told Povenz that the contract for the Jeep with Pop had a typo and was invalid and Pop had illegally refused to return the vehicle, which was now stolen. Beam completed a Benton Township Police Incident Report on April 14, 2022, which indicates that he told the police that Pop stole his vehicle and that he intended to prosecute him. Deputy Povenz then filed a stolen vehicle worksheet listing the Jeep as stolen for the law enforcement information network (LEIN). This is a statewide computerized information system that provides all Michigan police officers the ability to quickly check whether a vehicle is stolen. *See generally Law Enforcement Information Network (LEIN)*, Mich. State Police, https://www.michigan.gov/msp/le/lein [https://perma.cc/6JBX-6G56] (last visited Mar. 5, 2025). The county then issued a warrant for Pop's arrest for stealing the Jeep. Pop was unaware of the warrant; no one told him that Brookfield reported the Jeep stolen or that a warrant had been issued for his arrest.

In October 2022, Pop tried to renew his registration for the Jeep but was denied because his vehicle was listed as stolen. Pop then went to the Benton Township Police Department to inquire as to why his vehicle was listed as stolen, where he was consequently arrested for stealing the Jeep. Pop was later released on bond.

Pop moved to dismiss the criminal charges against him for stealing the Jeep, providing evidence that he had been the registered owner of the Jeep since November 2021. The next day,

the county prosecutor requested that the case be dismissed and the court signed a *nolle prosequi* order.

Before Pop's criminal charges were dismissed, however, his vehicle was seized in the incident underlying this dispute. The timing is significant because it means that the information deputies had at the time of seizure indicated that the vehicle was stolen. On the seizure date, Povenz contacted the Van Buren County Sheriff's Department and requested that deputies recover the Jeep. Deputies Gunther and Turner were dispatched to gain possession of the Jeep and arrived at Pop's house to speak to him. The interaction between Pop and the deputies was entirely amicable. The deputies never raised their voice at Pop nor used any force or threats of violence. At first, Pop refused to consent to a seizure of his vehicle. He explained his predicament and told the deputies that he did not steal the vehicle because he had title to it through his lawful purchase. The deputies continually responded that they believed him, but it was best if he just turned the car over to them and later sued the car dealership because otherwise, he could be arrested. Pop eventually relented and consented to the seizure of the vehicle after ten to fifteen minutes of interactions with the deputies.

About a year later, Pop sued Gunther and Turner, along with the Brookfield dealership, Beam, Froberg, Povenz, and Evan Smith,[1] asserting various federal and state-law claims. Gunther and Turner moved to dismiss the claims against them. They argued that there was no unconstitutional search or seizure because they were given permission to seize Pop's vehicle and that even if there was an unconstitutional seizure, they were protected by qualified immunity.

During a Rule 16 pretrial conference, the district court considered the deputies' motion to dismiss. The court noted that although the deputies could engage in a "knock and talk" with Pop

---

[1] Evan Smith was the police sergeant responsible for Pop's arrest when he tried to renew his vehicle registration.

and could seize consensually handed-over property, Pop had made out a plausible claim that his consent was not voluntary. Therefore, the court denied the deputies' motion to dismiss without prejudice. The deputies timely appealed.

## II.

We review de novo a district court's decision to reject a defendant's qualified-immunity defense at the motion-to-dismiss stage. *Rondigo, L.L.C., v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011). We must view Pop's complaint in the light most favorable to him, accept all factual allegations as true, and draw all reasonable inferences in his favor. *Id.* Here, however, there is video footage from the deputies' bodycams. Given the unique nature of qualified-immunity cases, we can generally rely on video footage at the motion-to-dismiss stage. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). To the extent that any aspects of the bodycam footage "'blatantly contradict' or 'utterly discredit' the plaintiff's version of events," we may rely on the footage over Pop's allegations. *Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023) (quoting *Bell*, 37 F.4th at 364).

## III.

At the district court, the deputies raised two issues in their motion to dismiss. First, the deputies claimed that there was no unconstitutional search and seizure because Pop's consent was voluntary. Second, the deputies claimed that even if there was an unconstitutional search and seizure, it was not clearly established, and they were therefore entitled to qualified immunity. Because we hold that Pop's complaint fails to allege a violation of a clearly established right, the deputies are entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[C]ourts of appeals should be permitted to exercise their sound discretion in deciding which of

the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

A.

The Fourth Amendment protects individuals from unreasonable searches and seizures, especially in the individual's home. *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). However, "certain categories of permissible warrantless searches have long been recognized." *Fernandez v. California*, 571 U.S. 292, 298 (2014). One such category is when the property owner consents to the search. *Id.* Under the consent exception, the search is not unreasonable so long as the owner gives free and voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (citation omitted). The determination of the voluntariness of the consent is a fact question to be determined by the "totality of all the circumstances." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Schneckloth*, 412 U.S. at 227)).

But because the deputies asserted qualified immunity, it is not enough for Pop plausibly make out a claim that his consent was involuntary; he must also show that it was "clearly established" from the caselaw[2] that his consent would be involuntary at the time of the challenged

---

[2] The deputies urge us to adopt the view that only Supreme Court precedent and not Sixth Circuit precedent can show a clearly established right. It is true that the Supreme Court has been unclear as to whether only its precedent can create clearly established rights. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 665–66 (2013); *Carrol v. Carman*, 574 U.S. 13, 17 (2014). But in the Sixth Circuit, we have repeatedly pointed to our own precedent to delineate clearly established rights. *See, e.g.*, *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). Faced with no clear rule from the Supreme Court, we will continue to follow our own precedent.

conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Myers v. City of Centerville*, 41 F.4th 746, 757 (6th Cir. 2022) ("A defendant is not entitled to qualified immunity at the pleadings stage if (1) the facts alleged make out a violation of a constitutional right and (2) that right was clearly established when the event occurred so that a reasonable official would have known that his conduct violated it." (cleaned up)). While it is not necessary to find a case directly on point for a right to be clearly established, *Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005), "existing precedent must have placed the . . . constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has also repeatedly warned courts not to define clearly established law at too high a level of generality and, instead, look to whether the *particular* conduct was clearly established to violate the right. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). This specificity is especially important in the fact-specific context of the Fourth Amendment. *Id.* Ultimately, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

B.

Pop's complaint alleges that he consented only to give the Jeep to deputies Gunther and Turner after they threatened to arrest him, and he acceded to the tearful pleas of his family. The bodycam footage tells a different story. In the footage, Gunther and Turner spend around ten to fifteen minutes attempting to convince Pop it would be in his best interest to consent to seizure of his vehicle as it was listed as stolen and he could find himself later arrested. A back-and-forth conversation ensues where Pop eventually relents and let the deputies take his Jeep. Never were there any tearful pleas of Pop's family in the video of the deputies' interaction with Pop. If anything, Pop's son remains entirely calm throughout the ordeal as he cordially explains to deputy Turner why his dad was initially upset. Turner responds empathetically, asserting that the scenario

Pop has found himself in is "bull crap" and he would probably be upset at the police too if he was in Pop's situation, but he is glad that Pop decided to cooperate. Therefore, Pop's allegation that he consented only to seizure after a threat of arrest on the spot and the tears of his family is plainly contradicted by the bodycam footage, and we cannot rely on them. *See Akima*, 85 F.4th at 422 (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)); *see also Scott*, 550 U.S. at 380 (noting that the video record discredited plaintiff's allegations and therefore the court "should not adopt that version of the facts").

## C.

As to the remaining allegations in his complaint that are not contradicted, Pop bears the burden of proof to show that it was clearly established at the time of the officer's conduct that his consent was not voluntary. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Pop fails to do so.

Pop first contends that it is well established that coercion is prohibited police conduct and that a suspect's consent must be voluntarily given. That may be correct, but this is the high level of generality in qualified-immunity claims that the Supreme Court has repeatedly warned against. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("It is important to emphasis that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" (citation omitted)). Instead, Pop must point to caselaw that the deputies' alleged specific conduct here clearly established that Pop's consent was not voluntary.

In attempting to do so, Pop cites to three cases that have nothing to do with consent and instead merely establish that police helping third parties in property disputes are subject to the limitations set by the United States Constitution. First, Pop cites *Soldal v. Cook County*, 506 U.S. 56 (1992). In *Soldal*, the Supreme Court held that deputies assisting police in a private

repossession action were subject to the Fourth Amendment. *Id.* at 72. Second, Pop cites this court's decision, *Cochran v. Gilliam*, applying *Soldal* to hold that it is clearly established that a deputy's involvement in repossession is state action. 656 F.3d 300, 311 (6th Cir. 2011). Third, Pop cites the district court decision of *McFarland v. Bobs Saks Toyota, Inc.*, which states that deputies cannot engage in repossession of a vehicle without a legal basis. 466 F. Supp. 2d 855, 861–62 (E.D. Mich. 2006). None of these cases address voluntariness and fail to address the issue here. The deputies do not claim that they can seize Pop's vehicle without a legal basis; instead, they are arguing that Pop provided a legal basis when he consented. Any relevant caselaw must address the issue of consent.

And to that point, the facts and caselaw, if anything, indicate that Pop's consent *was* voluntary. First, while the deputies did tell Pop that if he did not consent to search the car he would risk later arrest, such "threats"[3] did not make Pop's later consent involuntary. Threatening to get a warrant does not make one's consent to search involuntary. *United States v. Salvo*, 133 F.3d 943, 954–55 (6th Cir. 1998). However, it can make the search coercive if the police could not have lawfully executed on the threat. *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003); *United States v. Ivy*, 165 F.3d 397, 402–03 (6th Cir. 1998) (distinguishing between threats that are allowed to obtain consent, such as a threat to obtain a warrant, and threats that are not allowed, such as a threat to take away a suspect's child); *see also United States v. Watson*, No. 96-5037, 1997 WL 377035, at *3 (6th Cir. July 2, 1997) (per curiam) ("Notifying a person that a warrant can be obtained does not render consent involuntary unless the threat to obtain a warrant is baseless."). Because the car was listed as stolen and Pop had already been arrested, the deputies'

---

[3] Because we are at the motion-to-dismiss stage, we will assume that the deputies' statements that Pop could be arrested if he kept the car were threats of arrest.

threats were not baseless and were instead plausible statements of truth: Pop could plausibly be arrested by later deputies if he is caught driving this car. Indeed, this very circuit has described the proposition that Michigan LEIN information can establish probable cause as "a natural extension of this Court's holding that a digital 'license check' can establish probable cause." *United States v. Conley*, No. 21-1723, 2023 WL 165966, at *4 (6th Cir. Jan. 12, 2023).

Pop argues, without case citation, that the threat of the warrant *was* baseless because the police had not sought a warrant to date. That argument is unconvincing as there is no reason to infer that the lack of a warrant for a stolen car would mean it was "baseless" to say that one could be obtained. *See Salvo*, 133 F.3d at 955; *see also United States v. Carter*, No. 1:20-cr-62, 2021 WL 2592561, at *5 (S.D. Ohio, June 24, 2021). Instead, the decision to not obtain a warrant is a simple matter of police discretion and it is incorrect to claim that police are to be expected to get a warrant as soon as they are able to. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1509 (6th Cir. 1988) (noting that deputies need not seek a warrant as soon as they have probable cause). In fact, the Supreme Court has explicitly noted that courts should not fault police who, despite having evidence to make out probable cause for a warrant, opt to, instead, first attempt to obtain consent to search. *See Kentucky v. King*, 563 U.S. 452, 466–68 (2011). Following that guidance, we will not unduly read into the discretionary decision of the police to first attempt to obtain Pop's voluntary consent as evidence that they could not obtain a warrant.

Pop could perhaps argue that the arrest threats were baseless because the deputies had countervailing information from Pop that the car was not stolen. However, clearly it would not make sense if mere protestations of innocence from a suspect whose vehicle is listed as stolen could defeat probable cause. *See Carter*, 2021 WL 2592561, at *5 ("[W]hatever the actual facts regarding his ownership, . . . police officers are entitled to rely on a report that the vehicle was

stolen to support their conclusion that the car is, in fact stolen.  After all, most persons who are caught in a criminal act would deny liability for that crime, so [a suspect's] protestations of innocence cannot undo the probable cause that the stolen vehicle report created."); *see also Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("The fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause and an officer's failure to investigate an arrestee's protestations of innocent generally does not vitiate probable cause." (cleaned up)); *Loftin v. City of Prentiss*, 33 F. 4th 774, 782 (5th Cir. 2022) (similar).  Moreover, statements that the deputies believed that Pop was innocent do not defeat any probable-cause inquiry.  These statements could just be normal, de-escalatory police tactics.  *Cf., e.g.*, *United States v. Burwell*, 763 F. App'x 840, 848 (11th Cir. 2019) (example of police being friendly and understanding with suspect in order to obtain consent being valid police tactic).  And regardless, probable cause is an objective inquiry detached from the subjective views of the police officer. *United States v. Anderson*, 923 F.2d 450, 456 (6th Cir. 1991); *see also Florida v. Royer*, 460 U.S. 491, 507 (1983) ("[T]he fact that the officers did not believe there was probable cause . . . would not foreclose . . . justifying [suspect's] custody by proving probable cause[.]").  Ultimately, the stolen vehicle report is sufficient for probable cause and "once a police officer has sufficient probable cause, . . . he need not investigate further." *Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) (emphasis omitted).  But, again, *even if* we were to hold that there was not enough probable cause to get a warrant after carefully wading through the facts, that does not foreclose the validity of the deputy's threat.  The inquiry here is not if there was probable cause to get a warrant, but is, instead, if the deputies' threats were *baseless*.  And the analysis above determinatively shows they were not.

Secondly, the entire interaction between Pop and the deputies was de-escalatory, non-violent, and merely constituted the attempts of two deputies to persuade Pop to consent, as described by Pop's own complaint.[4] This scenario differs markedly from situations in which we have found consent to have been obtained in a coercive manner. In *Harris v. Klare*, the police stopped Harris, her mother, her father, and her sister because of an obstructed license plate. 902 F.3d 630, 633 (6th Cir. 2018.). The mother was arrested for obstructing a license plate, driving with no registration plates, driving with a suspended license, and possession of a forged instrument. *Id.* The police then suspected Harris's mother and father were engaged in drug activity, so they began waiting for a drug dog to arrive—which took an hour. *Id.* at 633–34. While waiting, Harris had to use the restroom and was escorted to the restroom by officer Kimberly Klare. *Id.* at 634. While en route to the restroom, Klare had unstrapped her gun and placed her hand on it several times. Klare told Harris that she may have to search her, and Harris acquiesced. *Id.* at 634. We ultimately found Harris's consent invalid, reasoning that "[w]hen a minor, untutored in her Fourth Amendment rights, seized for over an hour and in the presence of numerous armed police officers, with her arms secured behind her back and facing the choice of consenting to a search or being kept from the restroom, fails to resist that officer's search," a reasonable jury could find the consent was not voluntary. *Id.* at 641. In *Harris*, we also cited to the case of *United States v. Beauchamp* where this court held that preventing a suspect from walking away and placing your hands on him in a movement that suggests you will search him regardless is coercive and any "consent" is actually just acquiescence. 659 F.3d at 572.

---

[4] And even if Pop's complaint alleged otherwise, such allegations would be directly contradicted by the bodycam footage.

The highly coercive conduct in *Harris*, *Beauchamp*, and similar caselaw, unlike the relatively relaxed situation Pop faced, further strengthens the point that a reasonable officer would not consider the highly restrained conduct in the bodycam footage to invalidate Pop's consent.[5]  In truth, the deputies throughout the interaction were friendly and nonthreatening with Pop and his family and continually assured all parties that they did not want to arrest them but that it was in Pop's interest to surrender the Jeep.  We see no indication that our caselaw shows such conduct would be uniformly viewed by all reasonable officers as coercive.[6]

D.

Pop contends that the evidence could later show through discovery that factors such as his education level, his ability to communicate, and other aspects of his background could point to his consent being involuntary.  While the video does indicate that Pop may not speak the English language well, the complaint makes no such allegations.  "[W]hen the video does not blatantly contradict or utterly discredit the complaint, we do not consider it on [a] Rule 12 motion.  Instead, as when assessing any motion made under Rule 12, we rely on the allegations in the pleadings alone." *Saalim v. Walmart, Inc.*, 97 F. 4th 995, 1002 (6th Cir. 2024).  The complaint merely alleges that Pop initially did not consent to the seizure of his vehicle before later being convinced to do so by the two deputies.  That is not a clearly established constitutional violation.

---

[5] This is even more so given caselaw that shows that even when officers use force in the past (which they did not do here), consent can *still* be voluntary.  This court in *United States v. Sheckles* upheld a decision that an individual could validly give consent even though nine to ten officers barged into her apartment with guns drawn at night, while she was pregnant, undressed, and sleeping with a small child and question her for an hour because by the time she consented, the use of force was over.  996 F.3d 330, 347 (6th Cir. 2021).  The conduct of the deputies in Pop's case do not even come close to a similar use of force.

[6] The dissent makes a mountain out of a molehill of our discussion of *Harris* and *Beauchamp*.  We are not claiming that these cases set any floor or dispositively decide Pop's claim by themselves.  Instead, we reference these cases only to note that typically coercive conduct is much more intense than that experienced by Pop, so it would be reasonable for an officer in defendants' position to believe that Pop was not coerced.  And confusion and disagreement among reasonable officers is all that is needed for qualified immunity.  *See Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) ("If reasonable officials could disagree on the issue, immunity should be recognized.").

But even if Pop had appropriately pleaded those allegations, the deputies would still be entitled to qualified immunity. Caselaw sets no clear rule that an individual who does not grasp the English language well cannot consent. In fact, the caselaw states the opposite: consent can be voluntarily given by someone who does not speak fluent English depending on the circumstances. *See*, *e.g.*, *United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2006) (determining that defendant who had a "tenuous grip on the English language" freely and voluntarily gave consent); *see also, e.g.*, *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (collecting caselaw from several circuits that individuals who do not understand English, but can respond to general officer questions, can consent). And while lack of education can certainly be considered in a totality-of-circumstance test to determine the voluntariness of consent, *e.g.*, *United States v. Jones*, 846 F.2d 358, 360–61 (6th Cir. 1988), there is no per se rule in this circuit—or any circuits for that matter—that lack of a formal education completely abrogates any voluntariness of an individual's consent.

E.

Despite Pop's inability to show a clearly established violation of the Fourth Amendment, the dissent would hold otherwise. In so doing, the dissent accuses us of applying the incorrect burden of proof and, instead, erroneously suggests that it is the *defendants'* burden of proof to show that a constitutional right was not violated in a qualified immunity posture. The dissent is mistaken. It is true that when it comes to evaluating the actual Fourth Amendment violation, the burden of proof is on the officer to show consent. *See Andrews v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012). But we are not solely analyzing whether a constitutional right was violated. As permitted in *Pearson*, 555 U.S. at 236, our decision today is a ruling on qualified immunity, which is fundamentally a separate issue with additional, differing analysis beyond just deciding

whether a reasonable jury could find that plaintiff's constitutional right could have been violated. Indeed, as the Supreme Court has explicitly stated, "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985). This is why the passage the dissent incorrectly cites in *Andrews* for the proposition that the burden of proof is on the officers in qualified immunity was, in truth, from the court's consideration of the Fourth Amendment prong and not the qualified-immunity prong. *See Andrews*, 700 F.3d at 854. We have never held that the burden of proof is on the defendant officers when it comes to the qualified-immunity stage of the litigation. In fact, we have consistently held the opposite. *See, e.g.*, *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) ("The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." (alteration removed) (internal citations omitted)).

The dissent's error on the burden of proof is compounded throughout its analysis as it continually fails to grapple with defendants' assertion of qualified immunity. But again, this is not just a Fourth Amendment case, it is also a qualified-immunity case. Therefore, the question is: has Pop pointed to any caselaw which shows that it was clearly established that every reasonable official in the deputies' position would know that a suspect in Pop's position was not giving his consent voluntarily. *See Myers*, 41 F.4th at 757. Pop has not. The three cases he explicitly directs us to, *Soldal*, *Cochran*, and *McFarland*—as discussed above—do not even have anything to do with consent.

The dissent too cannot point to any cases that indicate the law on this issue is clearly established. Instead, the dissent paints a broad general idea that it is clearly established that it is unlawful to take property without that individual's consent. But this is exactly the sort of "high level of generality" that the Supreme Court has repeatedly instructed courts of appeals to not

engage in. *Ashcroft*, 563 U.S. at 742. Avoiding such high level of generality is "especially important in the Fourth Amendment context" where we must look at if the "*particular* conduct" has been established to be unconstitutional. *Mullenix*, 577 U.S. at 12. Defining the clearly established violation here as merely taking property without consent is at such a "high level of generality," *Aschroft*, 563 U.S. at 742, that one could not make it any more general if they tried. Pop (and the dissent) instead must point to more particularized cases of law. A case establishing perhaps that officers cannot ask for consent after previously being denied or maybe a case that states that officers cannot seek to obtain consent by explaining to the suspect the very real threat that he may face arrest otherwise for driving a stolen car. These cases do exist in this circuit, but they state the opposite. Officers can ask for consent after being previously denied, *see Lucas*, 640 F.3d at 175, and officers can obtain consent by noting the threat of a warrant, *see Salvo*, 133 F.3d at 954–55. Therefore, not only is there no clearly established law that states *every* reasonable officer in the deputies' position would know Pop's consent was involuntary, but there is, in truth, caselaw that suggests the opposite.[7]

Finally, the dissent argues it is "generally inappropriate" to grant a 12(b)(6) motion on qualified immunity. But, where, as here, the validity of the qualified-immunity defense is "apparent from the face of the complaint," we can—and have decided—qualified immunity on a motion to dismiss. *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021). What is more, we have bodycam footage of the entire interaction giving us a "sufficiently developed record" to decide the "immunity question[.]" *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017). "The Supreme Court has clearly emphasized that 'qualified immunity questions should be resolved at the earliest

---

[7] But again, we are not holding one way or the other. We are simply holding that the presence of such conflicting cases indicate that the right cannot be clearly established.

possible stage of litigation.'" *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)). Following this directive, we now resolve the qualified immunity question.

\* \* \*

To conclude, Pop has failed to satisfy his burden under qualified immunity. The caselaw, as articulated above, if anything, points to Pop's consent being voluntary. But even if it was not, at best, Pop's complaint can make out only the existence of a debate as to his voluntariness. And "if there can be reasonable disagreement about whether the officer's conduct was unlawful based on the law at the time of the incident, then the rights cannot be considered clearly established." *Barton v. Martin*, 949 F.3d 938, 954 (6th Cir. 2020) (brackets and internal quotation marks omitted).

IV.

For the foregoing reasons, we reverse the district court's denial of qualified immunity to defendants Gunther and Turner.

**CLAY, Circuit Judge, dissenting.** Plaintiff Mike Pop had legal possession of a Jeep Cherokee when two police officers approached him and demanded that he hand over the vehicle. Though Plaintiff initially refused, he eventually relented after fifteen minutes of repeated warnings and threats of arrest by the officers. Despite the frequent threats from the officers, and despite the fact that the officers knew Plaintiff had legal ownership of the vehicle, the majority finds that Plaintiff "voluntarily consented" to the surrender. Because a factfinder could reasonably find that Plaintiff did not voluntarily consent, I respectfully dissent.

**I**

On November 15, 2021, Plaintiff purchased a Jeep Cherokee from Brookfield Chrysler Dodge Jeep, Inc. ("Brookfield"). Both Plaintiff and Brookfield signed a Retail Installment Sails Contract ("RISC") on the date of the purchase. Typically, before an RISC is signed, a car dealership will first obtain a customer's credit history and then apply for a finance company's conditional approval to finance the deal. Once the finance company provides approval, the car dealership notifies the customer and the customer takes possession of the vehicle. That is what happened in this case. Plaintiff approached Brookfield to purchase a vehicle and provided a $3,000 deposit. Brookfield then separately contacted Michigan State University Federal Credit Union ("MSUFCU") to request financing for the vehicle. MSUFCU conditionally agreed, and executed an agreement with Brookfield to finance the purchase. Brookfield then told Plaintiff that he had been approved for financing, and both Brookfield and Plaintiff signed a RISC. The RISC provided that Plaintiff was to make 84 monthly installments to Brookfield. After the agreement was signed, and after Plaintiff signed an Application for Michigan Title and Registration, title and ownership of the vehicle passed to Plaintiff.

Yet after the finance company gave its conditional approval, it apparently decided that the car dealership could not meet the terms of the financing contract; consequently, MSUFCU refused to honor its financing agreement with Brookfield. Brookfield responded by asking Plaintiff to come to the dealership in February 2022, three months after Plaintiff had purchased the vehicle. After Plaintiff arrived at the dealership, Brookfield told him that he must return the vehicle due to "a paperwork error," to which Plaintiff refused. The dealership then attempted to regain the Jeep via a towing service and by filing a claim with Brookfield's insurance company, but both efforts were unsuccessful. Brookfield then turned to law enforcement and filed a stolen vehicle report on April 14, 2022, with the Benton Township Police Department, falsely claiming that the vehicle had been stolen. After speaking with two of Brookfield's employees, and without conducting any further investigation, an officer with the Benton Township Police Department filed a stolen vehicle report with the Law Enforcement Information Network System ("LEIN"). The officer then sought a felony warrant for Plaintiff's arrest for unlawful driving away of a motor vehicle, and a local prosecutor issued an arrest warrant for Plaintiff several days later.

Six months later, in October 2022, Plaintiff attempted to renew his registration for the Jeep. However, the Michigan Secretary of State's office informed him that the vehicle was reported stolen. One month later, on November 8, 2022, Plaintiff visited the Benton Township Police Department to address the matter, at which time he was arrested based on the outstanding warrant. The prosecution later dropped the charges and the court signed an order of *nolle prosequi* on December 21, 2022.

A few days prior to the court's *nolle prosequi* order, on December 12, 2022, two Sheriff's deputies were dispatched, presumably at Brookfield's request, to recover the vehicle from Plaintiff. Those officers, Gregory Gunther and Anthony Turner (collectively, "Defendants"), approached

Plaintiff's house and first met with Plaintiff's wife. Defendants asked Plaintiff's wife if she had any paperwork regarding the Jeep, and she responded by providing a copy of the Brookfield RISC. Defendants then left the property for thirty minutes, returned to meet with Plaintiff, and proceeded to have a conversation with both Plaintiff and his son. Body camera footage depicted the interaction between the parties. Plaintiff, who was born in Romania and speaks English as a second language, frequently relied on his son to help translate throughout the encounter.

The encounter began with Defendants asking Plaintiff to relinquish the vehicle to Benton Township. Defendants told Plaintiff that the vehicle was reported stolen, to which Plaintiff responded by noting that he had title to the Jeep and was in court trying to resolve the issue. Plaintiff also told the officers that he had been previously arrested for possessing the Jeep. The officers then proceeded to repeatedly tell Plaintiff that he needed to return the vehicle, and that if he did not, he could face negative repercussions, including arrest. Throughout the encounter, Defendants repeatedly indicated that they believed Plaintiff did in fact have legal possession of the Jeep. Specifically, the officers stated on various occasions: "[s]eems like you [Plaintiff] have a legitimate civil suit against the dealer," Bodycam Footage, 6:38; "[y]ou are not a thief—I can see you are not a car thief," *id.* at 6:53; "[i]f I thought you were wrong, I would already have cuffs on you," *id.* at 9:26.

After nearly fifteen minutes of repeated warnings and demands from Defendants, Plaintiff finally acquiesced to the officers' demands and told his son to get the Jeep. A tow truck then arrived at Plaintiff's property to remove the vehicle, and Brookfield regained possession of the Jeep several days later. Plaintiff subsequently filed a complaint in the U.S. District Court for the Western District Michigan against various parties, including a 42 U.S.C. § 1983 claim for Fourth Amendment unconstitutional seizure against Defendants. Defendants moved to dismiss the

Complaint, which the district court denied. Defendants now appeal the district court's determination, arguing that the district court should have dismissed the complaint against them based on qualified immunity.

**II**

The Fourth Amendment of the U.S. Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971). There are, however, certain exceptions that may protect a defendant from civil liability in Fourth Amendment suits. For example, "a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). Consent may consist of "words, gesture, or conduct," but it "has effect only if it is given freely and voluntarily." *Id.* "Consent must be proved by clear and positive testimony, and must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977) (cleaned up). It is also the officer's burden to establish that the consent exception is applicable. *Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 854 (6th Cir. 2012). Additionally, an official may be protected from civil liability by qualified immunity. However, "[a] defendant is not entitled to qualified immunity at the pleadings stage if (1) the facts alleged make out a violation of a constitutional right and (2) that right was clearly established when the event occurred so that a reasonable official would have known that his conduct violated it." *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 757 (6th Cir. 2022) (cleaned up). "Since the defendant officers have raised the qualified immunity defense, plaintiff

bears the burden of showing that defendants are not entitled to qualified immunity." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

The majority contends that Plaintiff voluntarily consented to Defendants' seizure of the Jeep. That contention is misguided, and is not supported by the record. To begin, the majority applies an incorrect burden of proof. According to the majority, it is Plaintiff's burden to demonstrate that his consent was not voluntary. However, the case which the majority cites for that proposition, *Johnson*, does not support that statement of law. 790 F.3d at 653. Instead, *Johnson* only holds that a "plaintiff bears the burden of showing that defendants are not entitled to *qualified immunity*." *Id.* (emphasis added). *Johnson* does not hold that a Plaintiff must prove lack of consent. Instead, this Circuit has explicitly held that defendant-police officers raising a voluntariness defense bear that burden. *Andrews*, 700 F.3d at 854 ("The burden to establish that the exception applies is on the officer invoking consent.").[1]

In reviewing the evidence presented, it is clear that Defendants have failed to meet their burden. It is important to first establish that the officers had information demonstrating Plaintiff's innocence well before Plaintiff spoke with Defendants. When Defendants first arrived at Plaintiff's residence, they spoke with Plaintiff's wife. She provided Defendants with the RISC agreement that Plaintiff had signed with Brookfield, which demonstrated not only that Plaintiff had entered into a binding agreement with Brookfield, but also that Plaintiff had legal possession

---

[1] The majority attempts to argue that the dissent misreads *Andrews*, and that the burden always lies with the plaintiff in the qualified immunity context. This is a plain misreading of *Andrews* and a misunderstanding of qualified immunity. The question of whether a party gave consent is a "threshold question" that must be answered before conducting a traditional qualified immunity analysis. *Andrews*, 700 F.3d at 854. In evaluating that threshold question, *Andrews* quite clearly instructs that the burden of proof lies with the party invoking the consent exception. *Id.* If the answer to that threshold question favors the party invoking qualified immunity, the analysis then turns to a traditional qualified immunity review. *See id.* at 856. It is at this point that the burden shifts to the plaintiff. *Id.* at 853.

of the Jeep. The agreement is a mere six pages long, is signed by both Brookfield and Plaintiff, and clearly outlines that Plaintiff is the owner of vehicle. Any individual who took even a cursory glance at the document would understand that Plaintiff was the valid owner of the Jeep. And in fact, Defendants themselves appeared to concede that Plaintiff had legal possession of the vehicle. Throughout the encounter, Defendants made repeated statements to Plaintiff indicating the officers' belief in his innocence, including: "[s]eems like you [Plaintiff] have a legitimate civil suit against the dealer," Bodycam Footage, 6:38; "[y]ou are not a thief—I can see you are not a car thief," *id.* at 6:53; "[i]f I thought you were wrong, I would already have cuffs on you," *id.* at 9:26.

Despite this very obvious proof of innocence, and Defendants' acknowledgement of the same, the officers nevertheless persisted to demand that Plaintiff turn over the vehicle. For nearly fifteen minutes, the officers repeatedly demanded that Plaintiff surrender the Jeep, and warned that failure to comply would likely result in arrest. From Plaintiff's perspective, these threats of arrest could not have appeared as mere idle warnings. Not only were Defendants uniformed Sherriff's deputies, but Plaintiff had also been arrested just weeks prior due to his possession of the Jeep. Any logical person sitting in Plaintiff's shoes would have fairly assumed that failure to comply with Defendants' demands would result in yet another arrest.

It is Defendants' burden to show that consent was voluntary. In this case, there is little to definitively establish that Plaintiff voluntarily consented to surrender the Jeep. The majority emphasizes that the interaction between Plaintiff and Defendants was non-violent, de-escalatory, and involved no raising of voices. Yet a factfinder could see the encounter in a very different light. For fifteen minutes, the officers warned that Plaintiff could face arrest if he did not comply with their demands, which was a threat made all too real by the fact that Plaintiff had already once been arrested because of his dispute with Brookfield. Thus, a jury could conclude that the interaction

- 23 -

was anything but amicable and de-escalatory. Instead, a jury could determine that the vast imbalance in power dynamics, combined with the length of the interaction, made Plaintiff's decision wholly involuntary. Where there are clearly differing interpretations of the facts, it is the role of the jury, and not the courts, to determine the outcome of a case. *See, e.g.*, *Onwenu v. Bacigal*, 841 F. App'x 800, 811 n.7 (6th Cir. 2021) (finding that differing factual interpretations of an officer's motivation are best left to a jury).

The majority argues that the officers' threats of arrest did not render involuntary Plaintiff's alleged consent. According to the majority, this is because the threats were not baseless; to the majority's thinking, the car was reported stolen and Defendants believed that the LEIN report provided probable cause for arrest. The majority's argument, however, misinterprets our caselaw. The majority cites to *United States v. Conley* for the proposition that a LEIN report can provide probable cause for arrest. No. 21-1723, 2023 WL 165966 (6th Cir. Jan. 12, 2023). Yet what *Conley* actually holds is that LEIN information is sufficient probable cause for a *traffic stop*. *Id.* at *4. *Conley* does establish that a LEIN report gives sufficient probable cause for an *arrest*. Furthermore, *Conley* does not hold that LEIN information establishes probable cause where the information is fraudulent. In this case, the underlying evidence that formed the basis of the LEIN report was entirely false. Brookfield reported that the Jeep was stolen, and the police either simply accepted Brookfield's story without any further investigation, or proceeded despite knowing the information to be false. Yet the RISC agreement between Plaintiff and Brookfield—the same agreement that Defendants were provided by Plaintiff's wife—clearly demonstrates that the Jeep was not stolen.

The majority further contends that Plaintiff cannot rely on evidence that Defendants had "countervailing information" regarding Plaintiff's ownership of the Jeep. Specifically, the

majority states that Defendants' threats of arrest did not become baseless merely because Defendants were presented with information from Plaintiff that the Jeep was not stolen. According to the majority, this is because "mere protestations of innocence from a suspect whose vehicle is listed as stolen [cannot] defeat probable cause." Maj. Op. at 11. However, Defendants had more than "mere protestations of innocence" from Plaintiff. Instead, Plaintiff's wife provided Defendants with a copy of the Brookfield RISC. That document specifically detailed the legal agreement between Plaintiff and Brookfield, and demonstrated that Plaintiff was the legal possessor of the vehicle. Furthermore, Defendants themselves admitted at multiple points that they believed in Plaintiff's innocence.[2] Defendants were thus presented with concrete, verifiable evidence of Plaintiff's innocence and nevertheless continued to threaten Plaintiff with arrest.

To support its finding, the majority relies on inapplicable and irrelevant case law. For example, the majority cites to *Harris v. Klare*, 902 F.3d 630 (6th Cir. 2018). In that case, this Circuit held that a fourteen-year-old's consent to search was not voluntary where a police officer repeatedly placed her hand on a semi-unholstered gun and held the minor suspect for over an hour. *Id.* at 640–41. The majority also cites to *United States v. Beauchamp*, which held that a search was not voluntary where an officer placed his hands on suspect suggesting that the officer was about to commence a frisk. 659 F.3d 560, 572 (6th Cir. 2011). According to the majority, the officers in these cases engaged in far more coercive conduct than Defendants, thus demonstrating that

---

[2] The majority argues that Defendants' statements regarding their belief in Plaintiff's innocence do not defeat probable cause because those statements "could just be normal, de-escalatory police tactics." Maj. Op. at 11. The majority does not cite to in-Circuit case law to support its point. Instead, the majority vaguely references an Eleventh Circuit case which found that friendly "sweet talk" by an officer does not constitute involuntary consent. *United States v. Burwell*, 763 F. App'x 840, 848 (11th Cir. 2019). Nowhere does that opinion hold that an officer's explicit acknowledgement of a suspect's innocence is irrelevant to a voluntariness analysis. And no case law in this Circuit holds the same.

Plaintiff's consent was in fact voluntary. Yet *Harris* and *Beauchamp* do not set a floor for what is considered coercive. Those cases do not hold that the highly egregious conduct of the officers in those cases is the only type of conduct that can be considered coercive. Instead, both *Harris* and *Beauchamp* emphasize that in looking at whether consent is voluntary, a court must consider the totality of the circumstances. *Id.* at 571–72; *Harris*, 902 F.3d at 639. And in reviewing the totality of the circumstances of this case, Defendants have failed to establish that Plaintiff's purported consent was voluntary.

The majority argues that the dissent does not grapple with Defendants' qualified immunity assertion. Yet what the majority fails to recognize is that a traditional qualified immunity analysis is inappropriate for this case. Before beginning a traditional qualified immunity review, we must first ask a basic threshold question: whether the consent was voluntary. *Andrews*, 700 F.3d at 854. If the answer to that question is no, the analysis ends there, and a review of the two-step qualified immunity test is unnecessary. *See id.* And in this case, it is clear that Defendants have failed to prevail on the threshold question, as they have not demonstrated that Plaintiff's consent was voluntary. Accordingly, we do not need to undertake the kind of qualified immunity analysis that the majority advances.

But even if we were to adopt the majority's approach and proceed to the two-step qualified immunity review, it is evident that Defendants would still not prevail. It should be noted that this Court has repeatedly emphasized that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). The reason it is inappropriate to grant qualified immunity at this stage is because of the uncertainty that exists prior to discovery, in which the factual record is highly disputable. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d

223, 235 (6th Cir. 2005) (Sutton, J., concurring) ("But just as these considerations frequently will make it difficult for a plaintiff to surmount a qualified-immunity defense *after discovery,* so they make it difficult for a defendant to claim qualified immunity on the pleadings *before discovery* and before the parties (much less the courts) know what is being balanced against what."). Such is the case here. The majority spends much of its opinion focusing on facts that are either highly disputed or left up to interpretation. That analysis was conducted without the aid of discovery, which would have more fully developed the record and provided more sufficient means to evaluate this case.

Instead of waiting to evaluate qualified immunity after the motion to dismiss stage, the majority instead undertakes an "inappropriate" qualified immunity analysis. *Campbell*, 779 F.3d at 433. But even when pressed against the two-step qualified immunity standard, Plaintiff still prevails. First, Plaintiff has established that "the facts alleged make out a violation of a constitutional right." *Myers*, 41 F.4th at 757. Defendants clearly lacked Plaintiff's voluntary consent for the seizure of the Jeep, but nevertheless took illegal possession of the vehicle. An unlawful seizure of property by state actors is definitionally a violation of the constitutional protections contained in the Fourth Amendment. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). Second, Plaintiff has established that his right against an unlawful seizure of property "was clearly established when the event occurred so that a reasonable official would have known that his conduct violated it." *Myers*, 41 F.4th at 757. For decades, courts have emphasized that "[i]t is well settled" that a seizure "conducted without a warrant issued upon probable cause is per se unreasonable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted). And there was no warrant or court order authorizing seizure of the vehicle. Plaintiff has therefore easily met both of the qualified immunity elements, and Defendants should not be afforded such immunity.

**III**

Defendants have failed to satisfy their burden of establishing that Plaintiff's acquiescence was the result of voluntary consent. A reasonable factfinder could find that the officers' repeated questioning, the length and nature of the questioning, and the frequent and coercive threats of future arrest rendered Plaintiff's purported consent entirely involuntary. It is for this reason that this issue is best resolved by a jury and not by this Court. I would therefore affirm the district court's decision to deny Defendants' motion to dismiss.

For these reasons, I respectfully dissent.